WILLIAM SHARP

*v.*

EMMA A. SHARP.

*Filed at Ottawa March 27, 1886.*

1. DIVORCE—*condonation.* As between husband and wife, although the latter may, by her conduct, have condoned an offence against the marital relation committed by the former, yet a repetition of the improper conduct will operate to revive the offence supposed to have been condoned. Condonation is forgiveness by the injured party, upon condition the guilty party will not repeat the offence, and is dependent on subsequent good usage and conjugal kindness.

2. SAME—*extreme and repeated cruelty—what so regarded.* In this case the wife instituted proceedings for a divorce upon the alleged ground of extreme and repeated cruelty. There was proof of actual personal violence on the part of the husband in only two instances, about seven years intervening. The suit was not commenced until about four years after the second offence of that character. Notwithstanding the lapse of time before the bringing of the suit, and that actual physical injury was inflicted upon only two occasions, yet these, taken in connection with hard and unkind treatment on the part of the husband, extending over almost their entire married life,—a period of more than twenty years,— were considered as constituting "extreme and repeated cruelty," such as to justify the granting of a divorce at the instance of the wife, as for statutory cause.

APPEAL from the Appellate Court for the First District ;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Messrs. ABBOTT, OLIVER & SHOWALTER, for the appellant, discussed the case principally as to the facts, contending that the evidence failed to show such extreme and repeated cruelty as to warrant a divorce, citing, in support of that conclusion, *Von Glahn* v. *Von Glahn*, 46 Ill. 134; *Vigors* v. *Vigors*, 15 id. 186; *Turbitt* v. *Turbitt*, 21 id. 438; *Carter* v. *Carter*, 62 id. 446; *Embree* v. *Embree*, 53 id. 395; *Henderson* v. *Henderson*, 88 id. 248.

It is proper to eliminate the thrusting out of doors in 1872, as being analogous to a stale claim. *Lorenz* v. *Lorenz*, 93 Ill. 377.

The separation was by her consent, and can not be claimed as a desertion. Consent may be inferred from conduct. *Gray* v. *Gray*, 15 Ala. 779; *Gillinwaters* v. *Gillinwaters*, 28 Mo. 60.

By her conduct she purposely encouraged Sharp in his non-speaking, with the intent that it should continue long enough to ripen into ground for divorce. She can, therefore, have no relief upon that ground. *Cornish* v. *Cornish*, 23 N. J. Eq. 208; *Meldowney* v. *Meldowney*, 27 id. 328; *Gillinwaters* v. *Gillinwaters*, 28 Mo. 60.

Messrs. HOLDEN & FARSON, for the appellee, after referring to and commenting upon the evidence at some length, made the following points of law:

There may be desertion without absence. A man may desert his wife, and still live in the same house with her. *Stein* v. *Stein*, 5 Col. 55; *Rie* v. *Rie*, 34 Ark. 37; *Yeatman* v. *Yeatman*, Law Rep. 1 Prob. & Div. 489; *Fellows* v. *Fellows*, 31 Me. 342; *McDermot's Appeal*, 8 Watts & Serg. 251; *McGahay* v. *Williams*, 12 Johns. 293; *Hanberry* v. *Hanberry*, 29 Ala. 719.

Husband's support during his desertion is no defence. *Bailey* v. *Bailey*, 21 Gratt. 43; *Magrath* v. *Magrath*, 103 Mass. 577.

The reasonable cause, if any, for desertion, must be such as is of itself cause for divorce. *Moss* v. *Moss*, 2 Ired. L. 55; *Butler* v. *Butler*, 1 Pars. Sel. Eq. Cas. 329; *Groves' Appeal*, 37 Pa. St. 443.

Bad temper is no cause for desertion. *Hanberry* v. *Hanberry*, 29 Ala. 719.

Acts of personal violence, accompanied by neglect, and a want of proper and necessary food, fuel and raiment, and a want of proper and necessary medical assistance, are extreme cruelty to a wife. It is not necessary that great physical injury shall be inflicted. *Farnham* v. *Farnham*, 73 Ill. 497.

Threats of physical violence are competent evidence to prove cruelty, and when they are followed or accompanied by acts of actual malicious physical violence, they serve to magnify the atrocity of the threats. *Ward* v. *Ward*, 103 Ill. 377.

When force and violence, preceded by deliberate insult and abuse, have been once wantonly and without provocation used, the wife can hardly be considered safe. *Poor* v. *Poor*, 8 N. H. 307; *Ward* v. *Ward, supra.*

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The bill in this case is for divorce, and was brought by Emma A. Sharp, in the circuit court of Cook county, against her husband, William Sharp. On the final hearing, the circuit court dismissed the bill for want of equity. Complainant removed the cause to the Appellate Court for the First District, where the decree rendered in the trial court was reversed, and the cause remanded, with specific directions to that court to enter a decree on behalf of complainant for a divorce. Defendant now brings the case to this court on appeal, and seeks a reversal of the judgment of the Appellate Court.

Two statutory grounds are alleged in the bill for divorce,— first, desertion; and second, extreme and repeated cruelty. This court is inclined to concur with the Appellate Court in

its opinion, the charge of extreme and repeated cruelty is sufficiently sustained by the testimony to warrant a decree for a divorce, and for that reason it will not be necessary to consider whether defendant has been guilty of willful desertion of complainant for a period of more than two years, in the sense those terms are used in the statute.

Of the two principal acts of physical violence proved to have been inflicted by defendant on the person of complainant, one occurred in 1872 and the other in 1879, and this bill was not filed till March 8, 1883. Were this all this record contained concerning the marital relations of the parties, it might be well doubted whether these two acts of physical violence, occurring so many years apart, would constitute any just or even statutory grounds for divorce. It is the constantly occurring events in the lives of the parties prior to the first act of violence, intervening both acts, and subsequent to the last one,—many of them of little moment if unconnected with other things, and others serious in their nature,—all considered together, that constitute the body of what the statute defines as "extreme and repeated cruelty." It is doubtless true two or more severe acts of personal violence inflicted upon the wife under a sudden impulse of passion by the husband, might be regarded as a less outrage than slighter violence under circumstances calculated to inflict mental agony. What is "extreme and repeated cruelty," as those terms are employed in the statute? Surely, it does not always consist wholly in a blow struck in anger, or other acts of physical violence. These are elements that must be found in every definition of the offence. But that is not all. This court has said in *Ward* v. *Ward*, 103 Ill. 477, it is difficult to define with precision what is and what is not extreme and repeated cruelty. And, accordingly, it was said in the same case: "Undoubtedly, extreme and protracted suffering may be produced primarily by operating on the mind alone, and hence threats of physical violence, and false charges of adultery,

maliciously made, are competent evidence to prove cruelty, (*Kennedy* v. *Kennedy*, 73 N. Y. 369,) and when they are accompanied or followed by acts of actual malicious physical violence, they serve to magnify the atrocity of the act." In *Farnham* v. *Farnham*, 73 Ill. 479, where two distinct acts of physical violence were inflicted upon the person of the wife, but no great physical injury was done at either time, it was said: "The jury could very properly consider the abusive language which the evidence showed he applied to her, not only in their private room but in the presence of strangers, as characterizing those acts of physical cruelty, and as giving to them a poignancy they would not otherwise have had." So in the case being considered, it is no two or three particular acts of physical cruelty that may have been proved, that constitute the body of the charge alleged against defendant. It is his whole conduct,—what he said and what he did since their marriage down to the day of their final separation, considered in connection with acts of physical injury inflicted, that prove extreme and repeated cruelty, if proved at all. It is extremely difficult, if at all practicable, to reproduce the events transpiring in real life so as to convey to the mind any adequate idea of what they are, by any testimony that can be given. In the daily life of these parties, things have occurred,—some capable of being proved and others not,—that have produced a separation, and whether the court shall annul the bonds of matrimony that existed between them, it is evident that estrangement is permanent.

Tracing briefly the history of these parties as it appears from the testimony, it is seen that soon after their marriage, which took place in 1859, on account of some slight offence defendant angrily pushed his wife away from him. That, of course, would long since have been forgotten had it not been for subsequent events. Coming home one night from church, it is said he "slapped her roughly on the shoulder." In 1867 it is testified he inflicted a slight injury upon her, and at

one time, she alleges, he "spit in her face." It was in 1872 he pushed her out of the house, and at her request threw her bonnet after her, and she went off and remained for some time. Later on, in 1879, it is proved by a number of witnesses, he kicked her two or three times, and otherwise ill-treated her. That was in January, 1879. Immediately after his return from Canada, in March, 1880, what may be called the silent period of their married life commenced, and continued for about two years and six months, when complainant left the home of defendant and this bill for divorce was filed.

These are the principal acts of physical cruelty complained of, and it may be admitted the evidence sufficiently sustains them, although most, if not all, of them are denied by defendant, and when he admits anything concerning them, it is in a modified form, which deprives them of their hurtful effects. There are other incidents in the conduct of defendant that characterize these acts of actual violence, and give to them a hurtful character they might not otherwise have had. She seems to have been ever since her marriage a nervous woman, and highly sensitive to anything she considered ill-treatment. It is admitted by his counsel "his temperament is taciturn and moody, with just a tinge of the misanthrope." The parties are childless. Complainant is about forty-five years of age, and has complained of ill-health ever since her marriage. Defendant is about fifty-five years of age, is a trunk maker, and has worked industriously at his trade, by which he has accumulated a little property, but not very much. It was only by the practice of strict economy he managed to provide for the family and save something from his earnings. What he had accumulated was much reduced by the disastrous fire of 1871, in Chicago, where his property was situated. The testimony of witnesses is to the effect "he treated his wife harshly, and was always cross and stern with her." Many times he used most abusive language to her, and often declared he would not live with her longer. On one occasion

when he was angry with her, he told her she ought "to be kicked from one end of the city to the other." At another time, when she was sick and confined to her room, he omitted to furnish her any attendance, and would leave her entirely alone, "leaving a piece of bread and some water on a chair" for her use. In 1866, perhaps, he left her in the street because she wanted to ride home with him in the street-car, and got angry and ran away from her. On that occasion she says he told her "he would throw himself into Lake Michigan before he would live with her any longer." He complained often of her medical expenses, and said he "didn't believe in paying doctor's bills," and that she "ought to die and go to heaven." On one occasion, when she had the neuralgia, she wanted the "extract of lettuce." He took an empty bottle and pretended to get it for her, but instead of doing so he filled the bottle with foul water taken from a tub that stood outside of the house. After she had used it he said she expressed herself as much benefited by its use, and, according to his own testimony, he then told her it was not the "extract of lettuce" at all, but that it was a vile liquid, the name of which was too vulgar to be repeated. The excuse given for the deceit practiced upon her in this respect does not relieve defendant from the severest censure. No doubt the liquid was what he says it was—foul water taken from a tub, and was not as bad as he told her it was. The least that can be said of it is, it was a "practical joke," the perpetration of which shows he is a coarse man. No one of any refined sensibilities will ever practice a "practical joke" upon or relate one concerning his friend. It ought to be remembered that anger dwells near by where ridicule enters, and wounds the sensibilities, and his friend is either estranged or made angry by the reckless disregard of his feelings. No matter what his motive may have been, his wife had serious ground for complaint on account of the deception practiced upon her. It was very unkind, to say the least of it.

Complaint is made as to other matters of annoyance, but it would answer no good purpose to recount them further, and it will not be done other than that which shall be said further on concerning the silence observed by the parties, one to the other.

With respect to the most serious acts of physical violence inflicted—one in 1872 and another in 1879—it is sought to palliate the conduct of defendant on the ground, on both occasions he acted under great provocation. This position is not warranted by the evidence. On neither occasion was there the slightest justification for the violence defendant inflicted upon his wife. The difficulty in June, 1872, arose concerning a slight over-payment she had made on a bill for some blinds. He had left with her an amount of money sufficient, as he supposed, to pay the bill, but it proved to be more than the amount he had left, and she got the money somewhere and paid it. Whether she was right or wrong in the controversy, it did not afford him the slightest pretext for thrusting her out of the house, as he did, in the night-time, and allowing her to find shelter in the house of a friend. There was still less provocation for the more violent assault made upon her in 1879. Her brother-in-law wished to see her about the care of his insane wife, who was the sister of complainant. It was known to her brother-in-law that defendant did not wish to have him come to his house, and most probably it was for that reason he called on the family that resided in the upper tenement of defendant's house, and sent a member of the family down to tell complainant he wished to see her. She went up and met her brother-in-law in the parlor, with the doors open into the other room where the family were. Soon afterwards defendant came up in a rage, and seized her brother-in-law to eject him from the house, but on being assured he would leave if defendant would release his hold on him, he let him go, and her brother-in-law then left the house. Defendant at once seized his wife in great anger and pushed

her along towards the stairway leading to the lower apartments, and it was at that time the witnesses say he kicked his wife twice in a most violent manner.   Defendant says he did not kick her, but thinks it may be, in the scuffle that ensued, his knee may have struck her.   Whether it was done with his foot or his knee, matters little.   It was actual physical injury inflicted without the slightest provocation.

It is submitted the acts of physical cruelty proved occurred too long ago to be now made the ground of a divorce on the part of the wife.   If they stood alone, and this record contained nothing else, there would be much force in the argument.   But in this connection it must not be forgotten it is shown defendant subjected complainant almost constantly to many little annoyances and indignities that rendered her life most unhappy.   Had this bill been brought immediately after defendant had so severely kicked his wife, in 1879, it would hardly have been insisted the evidence would not have sustained a decree for divorce on the ground of extreme and repeated cruelty.   Conceding the first act of personal injury in 1872 had been condoned by the wife by subsequent cohabitation, still the subsequent repetition of the offence would have been regarded as reviving the former, and proof of both, in connection with proof of harsh and unkind treatment, would constitute "extreme and repeated cruelty," within the statutory definition.

Stress is laid on the fact the last act of physical injury inflicted occurred more than four years before this bill was filed. If that fact is material, it is and must be because the wife, by subsequent cohabitation, condoned all acts of violence or other offences to her person.   Conceding the correctness of the position taken, is she now bound by any act of condonation?   Surely not.   Condonation is forgiveness by the injured party upon condition the guilty party will not repeat the offence, and is dependent on future good usage and conjugal kindness.   If it were not so, this whole doctrine would be a

fatal snare to all who, with honest purpose, endeavored to perform their marital obligations. (*Farnham* v. *Farnham*, 73 Ill. 497.) It is true there is no proof of personal violence since 1879, but the subsequent conduct of defendant clearly constitutes a breach of that kind of treatment implied in every act of condonation. After his return from his visit to Canada defendant never spoke to his wife but on one occasion, which will be noted further on, although they resided together under the same roof for about the period of two years and six months. On seeing him approach the house on his return after several days' absence, she unlocked the door and let him in. He did not speak to her and she did not speak to him. She prepared all his meals for him, as usual, unless it was his breakfast. They did not eat together. For a long period of many months' duration they preserved that silence towards each other. On one occasion during that time he thought proper to advise her not to use so much fuel. Instead of speaking to her he wrote her a letter concerning the matter. The letter was read in evidence, and he admitted it was in his handwriting. It may be, and doubtless is, true, that in the first instance both parties were to blame for the relation of self-enforced silence. In 1876 defendant went to the centennial exposition. Complainant wanted to go with him, but he did not take her. She was out of humor about it. On his return he promised her if he ever went on a visit again he would take her with him. While preparing to go on this visit to Canada, he said nothing to her about going with him, nor did he make to her any excuse why he would not take her. She also alleges he left her, at this time, without sufficient means for her support. Be that as it may, she was doubtless much wounded in her feelings because he did not invite her to go with him. It may have been for that reason she did not speak to him on his return. It matters little which one was most in fault in the first place, for it is quite evident defendant was most to blame for the long continuance of their unfriendly relations.

After matters had run along this way for about five months, she says, on a Sunday evening, about bedtime, when they were in their sitting room alone, she asked him if he intended speaking to her any more. His reply was, "he didn't see but matters were going on well enough." She again repeated the question in substance, and he replied, as she says, contemptuously, "sometime," left the room, and went to his bedroom and shut the door after him. On the 20th day of January, 1881, she wrote him a letter, and laid it on his dinner plate. After dinner it was gone, but she received no answer to it. That letter was read in evidence. In some respects it is a touching one, is kindly in spirit, and seems to manifest a sincere desire for reconciliation with her husband. Accepting her utterances as candid, the law would exact no more of her. She wrote as follows:

"Our lives together have, indeed, been very unhappy, with the exception of here and there a ray of sunshine and hope. Our future must be as you will it. I have no power to make it different. I have endeavored to live a christian life, faulty as it may have been. I could never get near enough to your heart to understand any of its secret workings, so I have no idea at the present time what your feelings are, or what your mind may be regarding our future. I will offer no reproaches. You have a conscience that will tell you, if allowed to do so, whether you have done all that God requires of a christian to do, and whether it has been your aim to honor Him in your life. I have no more to say. I should like to know your mind on the subject before you. I have taken this method of conveying my thoughts to you, not knowing that it would be agreeable to you to approach you in any other way. You can write or speak to me, as you think best."

After this appeal, it was a great wrong to the wife for the husband longer to remain silent, in comparison with which the bruises made upon her person by his hand and foot are as nothing. Although these parties resided in the same house

for two years after this letter was written, it does not appear from this record he ever addressed a single word to her either in anger or in kindness. This treatment ill accords with the duty a husband owes to his wife, and surely is not that conjugal kindness implied in every act of condonation. It is difficult to imagine anything more disagreeable and exasperating than the presence of one who, from mere sullenness, will not utter a word. The veriest solitude, where no living creature is visible, would be preferable. There is no more important right of the wife than that which secures to her in the marriage relation the companionship of her husband and the protection of his home. This right of companionship, so essential to all happiness, was withheld from the wife for a most unreasonable time by her husband, after she had invited and solicited it, both verbally and by writing. It is not necessary to inquire whether defendant's conduct in this respect amounted to willful desertion for a period of more than two years, under the provisions of the statute. It is enough that his ill-treatment of his wife in the manner the proof shows, constitutes a breach of that kindly usage which she had a right to expect from her husband, and she is not therefore barred from obtaining a divorce on the ground of extreme and repeated cruelty arising from acts done before, and although some years have since elapsed.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*


Mr. JUSTICE MAGRUDER: I do not concur in the above opinion.