HARMENA F. WESSELS

v.

JELDERK WESSELS.

*Divorce—Custody of Children—Alimony—Cruelty—Condonation.*

1.  A violent temper in a wife and the habitual use by her of opprobrious epithets toward her husband, will not justify personal violence on his part.

2.  Condonation is forgiveness for the past upon condition that the wrongs shall not be repeated; it is dependent upon future good conduct, and must be free and voluntary.

3.  In the case presented, the proof supports the allegations of the bill and the court erred in not granting a divorce to the complainant.

[Opinion filed December 8, 1888.]

APPEAL from the Circuit Court of Stephenson County; the Hon. WILLIAM BROWN, Judge, presiding.

Messrs. H. C. BURCHARD and P. J. GEIB, for appellant.

Mr. HENRY C. HYDE, for appellee.

C. B. SMITH, J.    This was a bill filed by Harmena F. Wessels, appellant, against her husband, Jelderk Wessels, appellee, asking for a divorce on the ground of extreme and repeated cruelty, and also asking for alimony and the custody of her infant children.

The answer denies some of the specific acts of cruelty and admits others, and alleges great provocation as an excuse therefor.

He charges his wife with having been an habitual drunkard before and ever since they were married, but says he did not know she was addicted to the use of liquor before they were married, and charges that she has an ungovernable and violent temper, and that in her fits of passion and anger she rails at him and calls him vile names and accuses him of

vile practices, and that occasionally, smarting under these accusations, he has used some violence, but alleges that he immediately repented and sometimes asked his wife's pardon, which was given.

The case was heard on bill, answer and replication and the proofs taken at the January term, 1888, and a decree was entered dismissing complainant's bill. From that decree appellant has taken an appeal and brings the record here for review.

The parties were married in 1878; they lived and were raised together in the same neighborhood and evidently were well acquainted with each other long before they were married. Whatever of love or affection or even of respect may have existed between them before and at their marriage, it is very evident that all traces of any such feelings soon vanished after their marriage, never to return. Their mutual vows at the marriage altar have been utterly forgotten and ignored. In their home there has been no mutual sympathy, no love, nor even a decent respect for the rights of each other; the turbulence and violence which began soon after their marriage, has grown until it is impossible for them to live longer together. They were both of German parentage; he of low Dutch, she of high Dutch.

The proof discloses numerous acts of personal violence inflicted by the defendant upon his wife, of greater or less severity. The first account of their trouble occurred within three months after their marriage. The defendant then first grossly insulted his wife, and then, because she resented it, he violently threw or pushed her out of doors. She had been ironing him a white shirt and had not succeeded in ironing it as nicely as he desired, and he upbraided her in an angry and insulting manner, and said he did not know he had married a wife that did not know how to iron a white shirt, and thereupon he threw the shirt in a rag-bag.

Again, in 1880, a controversy grew up in the home about the relation of defendant's sister and his hired man, and complainant made an insinuation touching the propriety of his sister's conduct toward the hired man, when defendant became

enraged, and slapped his wife in the face, and then chased her in the room and struck her in the face with his fist.

Again in December of the same year they had a quarrel, and defendant told his wife to keep still, which she declined to do, and he then put both hands around her neck and choked her.

In 1871 they got into a controversy about chopping up some beef out in the yard; defendant wanted to go to Freeport and his wife wanted him to stay and chop the beef. He ordered her into the house and threatened her with the axe, and she failing to go, he chased her into the house with the upraised axe. She called the school teacher to defend her, and thereupon he desisted from further pursuit.

In 1882, in December, he hitched up his team to go to mill and his wife desired to go with him as far as her sister's. She got on the load and said she would go. He said she should not, but assigned no reason why she could not ride with him; she became angry at his refusal to allow so reasonable a request and got down off the load and pulled out the whiffletree pins, and threw them away in the snow. Thereupon defendant seized his wife by the hair of the head and pulled her down on the ground and dragged her two rods through the snow, and then whipped her with a rawhide horse-whip around her body a half dozen times, as the witness who saw it said, "like I do around the horses," until "she hollared, John, help me." She then ran away and he ran after her. She says, "He struck me just like an old horse—it left red stripes across my back."

In 1884 another row came up about some painting he did on the house, which her father was to pay for; in an angry mood he was scratching the door with his feet, and his wife objected; he then said if "the old devil," meaning his wife's mother, did not give him some money for the painting he would cut the door, and did cut it. The wife became angered and called him a "self-abuser," whereupon he struck her over the head with a piece of pine board, nearly felling her to the floor, cutting her through the scalp and making a bleeding wound.

Again on a subsequent occasion, about two months before her child was born, in the winter time, on the occasion of some one of their many quarrels, he pushed his wife out of doors and locked the doors against her.

In addition to these acts of personal violence, he, on many occasions, accused her of a want of chastity, charged her with being an " old whore " and charged her with doing "something mean " with a little jew peddler and with a doctor. Told her one of her children was the child of Henry Greenwold, and charged her with going to see Henry Greenwold every time she went to town, and with "doing something mean" with him. On the occasion of the birth of two of her children he intimates that they are not his children and says he will not get her a doctor. On one occasion when they had been butchering, he became angry at some of her abusive language and went and got a new dress pattern she had bought of the jew peddler and put it in a tub of pigs' entrails. The foregoing recitals of his conduct toward his wife, running through the entire period of their married life, shows a systematic course of brutality and cruelty, both of act and word, rarely equaled, and yet we have recited but small part of it. The defendant seeks not to avoid the force and effect of this personal violence by denial of its truth (for the most of it he admits and other parts of it he says he can not remember), but rather by justifying himself and by condonation. How does he do it?

The answer charges the complainant with drunkenness in the first place. The evidence shows that the complainant occasionally drank intoxicating liquors, and that on several occasions she was sensibly under their influence; but we do not think the evidence establishes the fact that she was a drunkard or in the habit of getting intoxicated within the legal meaning of that word. She admits drinking whisky, but says it was at the time of her confinement, when she needed it, and at times of holiday and festival occasions with her family and her people, when most German people followed the custom, and that it was with the knowledge and consent of her husband. The defendant himself swears that he kept liquor in the house, and that he also drank wine, beer and whisky.

The most serious charge made in answer and supported by the proof was her violent temper, and vulgar and abusive language toward the defendant. The proof abundantly supports this charge against the appellant and shows her to have been utterly wanting in womanly qualities of refinement and modesty. The language she used toward her husband in the presence of the family, and of strangers, was too coarse and vulgar for repetition here; but everything we have said in relation to her manners and language as applied to her husband will apply to the fullest extent to his language and manners toward her. Both of them seem to have been utterly shameless and regardless of all the amenities and decencies of life in their intercourse with each other. To recite these long lists of quarrels and show their origin and ending would serve no useful purpose and we shall not attempt it further than to say that the defendant was the first aggressor in the controversy over the shirt, and if, before then, there had been any bonds of affection between them, he broke the slender tie by wantonly wounding the feelings of his young wife, and then following it up with personal violence from that time to the end.

But even if the defendant himself had not been as guilty as his wife in provoking quarrels, and in the use of coarse and vulgar language to her, and had himself been free from fault in that respect, we must still hold that her violent temper and opprobrious epithets, however insulting and scandalous they may have been, gave him no license to correct her by personal and physical violence. 1 Bishop, Mar. and Div., Sec. 765, note 2; Dillon v. Dillon, 32 La. Ann. 643; Gordon v. Gordon, 48 Pa. St. 226; Marsh v. Marsh, 64 Iowa, 667; Boeck v. Boeck, 16 Neb. 196; Eidenmiller v. Eidenmiller, 37 Cal. 364; Hawkins v. Hawkins, 65 Md. 104.

It has uniformly been held in this State that no language, however opprobrious or insulting, will ever justify, even strangers, beating each other, and certainly the rule ought not to be relaxed as between husband and wife. To allow the husband to beat his wife into submission, or to correct her delinquencies, would be a return to the barbarisms of the old

common law and make the wife the mere vassal or slave of the husband.

Lastly the defendant pleads condonation. At the time of the birth of the last child, complainant swears that when she was suffering intense pain and was very sick, scarcely knowing what she did or said, her husband asked her to forgive him all the wrongs he had done her, and they would afterward live as they ought to, and that then she told him she would forgive him. She swears that it was just before the birth of their last child, and when she was suffering the pains of childbirth, and when he thought she was going to die, he asked her to forgive him, and that she did so. If, under the circumstances upon which this forgiveness was obtained, it could be regarded as the free and voluntary act of the complainant, and be a condonation of the many wrongs done complainant, then the law imposed upon him the duty of treating his wife thereafter with conjugal kindness and affection. Condonation is forgiveness for the past upon the condition that the wrongs shall not be repeated, and is dependent upon future good conduct, and it must be free and voluntary. Sharp v. Sharp, 116 Ill. 509; Farnham v. Farnham, 73 Ill. 497.

The proof shows that immediately after this forgiveness he again commenced to treat her, if not with actual cruelty, yet with cold indifference and neglect, using many hard and cruel expressions to her in her sickness, when he spoke at all. She swears that he hardly spoke to her for two months, and on one occasion, at least, kicked her from his bed—when she went to plead with him to be kind to her, at least for the sake of the children. She swears he was cold and indifferent to her, and that he told her "he was cold to her as a stone," and he himself admits that he made use of this expression, and makes no claim on the witness stand that he treated her with kindness and affection after she had forgiven him. The proof also shows that since that time she has patiently forborne to renew her former offenses, and has kept her promise to treat him kindly.

We think that whatever of condonation there may have been between the parties, it was soon forfeited by the defend-

ant's subsequent bad conduct toward his wife, and he thereby renewed his former acts of cruelty. We think the proof supports the allegations of the bill, and that the court erred in dismissing the bill.

The cause will be remanded with directions to the court to set aside the order dismissing the bill and to grant the divorce at the costs of the defendant, and to make such order concerning the alimony and allowances and the custody of the children as the court shall deem right and just.

*Reversed and remanded.*