HATTIE J. BROWN, Appellant, vs. EDWARD M. BROWN, Appellee.

*Opinion filed December 16, 1914.*

DIVORCE—*condonation is upon condition that offenses will not be repeated.* Condonation by the wife of acts of cruelty upon the part of the husband is upon the condition that he will not repeat them and depends upon future good usage and conjugal kindness, and he cannot justify his acts of physical violence on the ground that the wife had a high temper and an active and vigorous tongue.

APPEAL from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

CHYTRAUS, HEALY & FROST, and EDWIN W. MOORE, for appellant.

DANIEL ANDERSON, for appellee.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

The circuit court of Cook county, on hearing the evidence, dismissed the bill which appellant, Hattie J. Brown, filed against her husband, the appellee, Edward M. Brown, for divorce, the care and custody of their son, about twelve years old, and to compel the defendant to convey to her all right, title and interest held of record by him to the property described in a deed, in which it was alleged the defendant by fraud, and without her knowledge, procured his name to be inserted as one of the grantees. An appeal from the decree was taken to the Appellate Court for the First District, and the cause was transferred to this court because a freehold was involved.

The witnesses appeared and testified before the court, so that he had an opportunity, which is denied to us, to judge of their credibility so far as there was any dispute

between them concerning the facts, but there was practically no such dispute. While the defendant offered excuses for his acts, and interpreted them, and the causes of them, in some instances differently from the complainant, he made no denial of the facts. The parties were married at the home of the complainant in Pleasantville, Iowa, on January 9, 1900, and after the marriage they came to Chicago. The complainant belonged to a family in very good circumstances and the parties had been betrothed for ten years. On the way to Chicago he told her that he had lived with a married woman two and a half years and they had a child; that finally she and her husband separated and she wanted him to live with her but he would not do it; that she was a poor woman with two children and he did not want to burden himself with two children, and that he would rather marry a woman with some money back of her, so that he could live without working. His belated confession, made after the marriage, when it was too late for her to refuse to enter into it, he said was due to his conscience hurting him a little bit and his effort to ease his conscience by confiding the facts to her. Naturally the result was not favorable to a harmonious married life. They lived in Chicago in a four-room basement flat, rented for $10 a month, and afterward in a five-room flat, for which they paid $13 a month. In 1901 the son, Donald, was born. In 1902 the defendant was afflicted with a disease which is contracted from immoral relations, and which he claimed was a consequence or recurrence of a disease contracted eight years before the marriage. In 1905 the complainant's father died, and she inherited as her share of the estate $27,000, and she then bought the flat-building, in which they occupied one of the flats as their home. The purchase price was $6320, subject to an encumbrance of $3500, and she paid the difference of $2820. The deed was to be made to her, and she supposed it was so made until she received it by mail after it had been recorded.

Her husband secretly told the draughtsman to make the deed to both of them as joint tenants and not as tenants in common, and it was so made through his fraud. When she found out how the deed was made she tried to have him rectify the wrong, but he refused to do it. His reason for the secret instruction, given at the trial, was, that in case of the death of one the survivor ought to have the property, and he thought it was pretty hard if he could not have as much as one-tenth of her inheritance. The relations of the parties as husband and wife were never pleasant, and after the fraud on his part they became much worse. He was in the habit of telling her how homely she was, and of saying that she had a sweet-potato nose and pop-eyes, which he said, at the hearing, was a method of joking that he had. It was also his habit to call her vile and vulgar names not fit to be printed, and to swear at her. He accused her of adultery with the family doctor and admitted on the trial that he had no cause for his charge. When she spoke of another man in a friendly way he immediately became jealous and said that he would have her watched. There were three instances of physical violence on his part, the first of which occurred in December, 1905. There was a quarrel about his taking the boy out in the forenoon when she intended to take him to a matinee in the afternoon. At that time he shoved and pushed her around from room to room and bruised her, and during the physical contest she broke a plate over his head. Two years later there was a similar occurrence, not of much importance but such as to leave marks of physical injuries. On the night of December 23, 1911, the third combat took place. He came home from a lodge at half-past eleven and was locked out, and after she let him in he got hold of her arms, pushed her down on her knees and bent her back over the bed, after which she attacked him with a slipper. He was always a failure as a money earner and business man, and after she received her money he contributed prac-

tically nothing to the support of the family. He had been in the stereoscopic view business and made a failure of it, and in a venture in Colorado he used $1500 inherited by himself and borrowed $1000 from her, all of which was lost. He sat in saloons much of his time and came home at very late hours at night and was lacking in thrift and business ability. At the hearing he attributed their troubles to her dissatisfaction concerning money matters, and explained that his conduct and language were due to his becoming very angry and exasperated on account of her language to him. She had a very high temper and an active and vigorous tongue, but that fact did not afford a sufficient excuse for his acts of physical violence. He attempted to excuse what he did on the night of December 23 by claiming that she was the aggressor and that he was only endeavoring to restrain her. Her wrists were discolored the next day, and the injury appears to have been more than would naturally have been occasioned by mere efforts to prevent her from assaulting him. It is evident that she had no respect for him at any time after his disclosure made on the way to Chicago, and especially after the fraud concerning the deed she had no regard for him. Their marital relations practically ceased, and if there was any condonation of the earlier offenses it was upon the condition that he would not repeat them and depended upon future good usage and conjugal kindness. (*Sharp* v. *Sharp*, 116 Ill. 509.) Considering the undisputed facts, the complainant was entitled to a divorce and to have the fraud in having the deed made as it was made, rectified.

The decree is reversed and the cause remanded.

*Reversed and remanded.*