EMMA A. SHARP

v.

WILLIAM SHARP.

</div>

DIVORCE—EXTREME AND REPEATED CRUELTY.—In a bill for divorce under our statute, if the evidence shall be considered as fairly showing at least two acts of physical violence committed upon the wife by the husband, and those acts, viewed in the light of attending circumstances, are sufficient to actually or apparently endanger her physical safety or *health*, to a degree which renders it impracticable for the wife to discharge properly her marital duties, she is entitled to a decree. The court is of opinion that the evidence makes out a case of extreme and repeated cruelty.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding. Opinion filed April 8, 1885.

Messrs. HOLDEN & FARSON, for appellant; that there may be desertion without absence, cited Stein v. Stein, 5 Col. 55; Rie v. Rie, 34 Ark. 37; Yeatman v. Yeatman, L. R. 1 P. & D. 489; Fellows v. Fellows, 31 Me. 342; McDermot's Appeal, 8 W. & S. 251; McGahay v. Williams, 12 Johns. 293; Hanberry v. Hanberry, 29 Ala. 719.

As to cruelty: Farnham v. Farnham, 73 Ill. 497; Ward v. Ward, 103 Ill. 483; Poor v. Poor, 8 N. H. 307.

Messrs. ABBOTT, OLIVER & SHOWALTER, for appellee; that the acts in question do not constitute the extreme and repeated cruelty known to our law, cited Vignos v. Vignos, 15 Ill.

186; Turbitt v. Turbitt, 21 Ill. 438; Carter v. Carter, 62 Ill. 446; Embree v. Embree, 53 Ill. 395; Henderson v. Henderson, 88 Ill. 248.

As to consent to desertion: Gray v. Gray, 15 Ala. 779; Gillinwaters v. Gillinwaters, 28 Mo. 60; Cornish v. Cornish, 23 N. J. Eq. 208; Meldowney v. Meldowney, 27 N. J. Eq. 328.

McAllister, J. This was a bill by Emma A. Sharp against William Sharp for a divorce, upon the grounds of desertion and extreme and repeated cruelty. There was a hearing upon pleadings and proofs, but the court below dismissed the bill for want of equity, and complainant appealed to this court.

From our examination of the record which contains all the evidence, we are of opinion that much the strongest tendency of the evidence is toward sustaining the charge of cruelty. So we shall confine ourselves to a consideration of the question. Was a case of extreme and repeated cruelty made out by the evidence?

A very learned and philosophical author has given an affirmative definition of legal cruelty thus: " Cruelty, therefore, is such conduct in one of the married parties as endangers, either apparently or in fact, the physical safety or health of the other to a degree rendering it physically or mentally impracticable for the endangered party to discharge properly the duties imposed by the marriage." Bishop on Marriage and Divorce, 5th Ed., § 717.

While this definition properly embraces some of the necessary elements of a case, and may be considered as an accurate condensation of the principles of the most leading cases as to the general doctrines of legal cruelty, yet it is not a sufficient definition of *extreme and repeated cruelty*, as our Supreme Court has construed those words in the statute of this State. By that construction, one instance of physical violence by one party, no matter how wanton or serious, and though attended with such circumstances of malignity and aggravation as to create the most reasonable apprehension of further bodily harm

to the other, and therefore to render it physically or mentally impracticable on the part of such endangered party to properly discharge the duties imposed by the marriage, yet if such single instance fall short of a malicious intent to take the life of the victim, the case, while it would be within the definition of Bishop, would not come up to the requirements of our statute, under the construction which the Supreme Court has felt constrained to give it on account of the words, " *and repeated,*" which the legislature saw fit to use in defining that particular cause for divorce. But the court has given it, in a majority of the cases, as humane and liberal construction as the language of the statute would admit of. Thus, in Harman v. Harman, 16 Ill. 90, Mr. Justice Skinner, who, upon questions involving the construction of statutes, was one of the most learned and able of judges, construed it in this language: " There must be *acts* or *threats* which raise a *reasonable apprehension* of bodily hurt; the causes must be grave and weighty, and show a state of personal danger incompatible with the duties of married life."

In Farnham v. Farnham, 73 Ill. 497, the court, by Mr. Justice Scott, says: " Two distinct acts of physical violence to the person of appellee are clearly proven. It is shown by testimony every way worthy of belief, outside that of appellee, that appellant, on two occasions, struck his wife in anger. This would constitute, under our statute, technical cause for divorce. No great physical injury was inflicted upon appellee on either occasion; but the jury could very properly consider the abusive language, which the evidence shows he applied to her, not only in their private room, but in the presence of strangers, as characterizing these acts of physical cruelty, and as giving to them a poignancy they would not otherwise have. It was proven he addressed to her in the coarsest terms, language that implied a want of chastity."

In the course of the opinion in Henderson v. Henderson, 88 Ill. 250, Mr. Justice Walker says, " This court, as well as all other courts acting under similar statutes, has held that it must be bodily harm, in contradiction to mere harsh or even opprobrious language or mere mental suffering; that the

Sharp v. Sharp.

cruelty must be grave and endanger life or limb, or at any rate, subject the person to danger of great bodily harm, and this is the rule of the English ecclesiastical court.    Evans v. Evans, 1 Hagg. C. R. 35.    This is referred to as the leading case in that court."    Upon a careful examination of the opinion of Sir William Scott in Evans v. Evans, we fail to find the rule as to legal cruelty laid down in such a restricted sense.    On the contrary, in Lockwood v. Lockwood, 2 Curt. Ec. 281, 7 Eng. Ec. 114, Dr. Lushington stated that the doctrine laid down in Evans v. Evans, was, " that there be either actual violence committed attended with danger to life, limb or health, or there must be a reasonable apprehension of such violence."

In Ward v. Ward, 103 Ill. 477, the opinion of the court was by Mr. Justice Scholfield; and it is significant that he quoted with approval the above statement from Harman v. Harman and Farnham v. Farnham, but makes no mention of Henderson v. Henderson, *supra*, in which a rule is announced which is incompatible with the doctrine of the other cases.    We think, therefore, from those circumstances, and upon principle, that the restricted rule of Henderson v. Henderson should not govern this case.

We are then brought to the conclusion that if the evidence in this case shall be considered as fairly showing at least two of the acts of physical violence charged in the bill of Mrs. Sharp to have been committed upon her by her husband, and if those acts, viewed in the light of attending circumstances, were sufficient to actually or apparently endanger her physical safety or *health*, to a degree which rendered it impracticable for her to discharge properly her marital duties, then she was entitled to a decree, and it was error to refuse it; a serious error, too, because a divorce for such a cause has its foundation in nature, by invoking the great law of self-preservation, which is higher than any obligations imposed by the marriage.

We have carefully examined this record, and are of opinion that Mrs. Sharp has made out a strong case for divorce. They were married in October, 1859.    He is a trunk maker by

trade, and an able bodied man. She was, and is, a slender, delicate woman, in very bad health. The inference is irresistible, that he began a course of ill-usage toward her not many months after the marriage. About six months thereafter she was very sick with spinal difficulty, accompanied with weak eyes, so that she had to be in a darkened room. She was helpless and had no help provided. For weeks he would each morning put some bread and water on a chair, and thus leave her alone the rest of the day. After some three weeks, a young, inexperienced girl was employed to take care of her. The girl, by mistake, gave Mrs. Sharp an overdose of medicine. This seriously affected her, and she thought she was dying. Mr. Sharp was there, and he evidently thought so too; but her repeated requests to him to get a physician were disregarded by him. At another time she was painfully affected with neuralgia; a lady friend had told her the extract of lettuce was good for it. Getting a bottle, she handed it to him, requesting him to go to a drug store and get the extract. Pretending to comply, he took the bottle and went out as if going to the drug store; but instead, he found a wash tub with dirty water in it and some fish for the cat. From that he filled the bottle, probably putting some coloring to it of something else, and took it to her for the extract of lettuce, and actually permitted her to take it, under the belief that it was what she had sent for, and then to harass her he tantalized her with the declaration that what she had been taking was made of nastiness, to which he gave a name, but which name it is needless to repeat. He fully admitted this outrage in his evidence, seeming to think the court and others would regard it as a capital joke upon that poor, sick woman. To our minds, it is a pretty good key to the malicious cast of his secret disposition toward his wife, and the danger to which she was subject; and it appears that in connection with the fact that he repeatedly saw her use that vile compound, he said it would be a good job when she was dead. In the fall of 1866, they being together about a mile from where they lived, here in the city, about half-past ten at night, he wanted her to get into a street car and go home alone. She being weakly, nerv-

ous and timid, insisted that he should go along. He refused, got angry, declared he would live with her no longer, and in this mood went away and left her alone in the street. One night in 1872, as she was about preparing to go to bed, without any just or reasonable provocation to any violence on his part, he forcibly pushed her out of the door of their house, shut the door behind her, then re-opened while she was pleading for re-admission to the house, threw her bonnet after her and bade her go away. Under this seeming disgrace of having been turned out doors by her husband, she was compelled to go alone at that hour, to the house of an acquaintance to find shelter.

In 1874, the upstairs part of Sharp's house was rented to a family of the name of Jennings. Mrs. Sharp had a sister who was married to a man of the name of Bemis; this sister was in ill health, and Bemis wished to consult with Mrs. Sharp concerning her. He came to the house one evening, Mr. Sharp being at home below, and on account of Sharp forbidding his wife the privilege of having company, B. went into the part of the house occupied by the Jennings family. Mrs. Sharp was invited up and came. She was in conversation with Bemis about his wife, when pretty soon Sharp came up in a great rage, forcibly took hold of Bemis to put him out; but on the latter telling him he would go out, Sharp then violently seizing hold of his wife and starting her in the direction of the stairway that led down to his part of the house, there in the presence of Bemis and several of the Jennings family, gave her two kicks, hustled her downstairs, threatening her life as she went. This act, with what he said to her when down stairs, are sufficient to show the danger to which this poor, sickly, submissive, inoffensive woman was subject while under the power of a husband whose only feelings toward her were those of hate, which had prompted him to acts of personal violence, and which were likely to urge him to further and more serious ones. They had no children. It was against his wishes for her to have any company and she submitted. For two years and five months before she finally left him, which was in March, 1883, it was an iron rule with

him, although dwelling in the same house, not to speak to her or occupy the same bed with her. No rule was ever better observed. We have not space to detail all the circumstances of aggravation. Though able to supply her, he denied her reasonable clothing, and sometimes even food. He so limited her in the use of fuel during the cold winters, that she actually suffered with the cold. He would complacently take the bed nearest the stove and compel her to sleep on a lounge; and when the weather was extremely cold, he would get up and shut the door to her room in order to secure more warmth in his. As was said by the great Sir William Scott: Undoubtedly justice is the first virtue of a court. *Humanity* is the second. But we are constrained to say that both justice and humanity are on the side of this most unfortunate woman. The decree of the court below will be reversed and the cause remanded with directions to the court below to enter a decree on behalf of Mrs. Sharp for a divorce.

<div align="right">Decree reversed.</div>