## BUSH *v.* BUSH.

### Opinion delivered October 7, 1918.

1. DIVORCE—CONDONATION.—Condonation is the voluntary forgiveness and remission of a cause for divorce upon the condition that the offender will reform and will not be guilty of another cause for divorce; such condonation, in order to constitute a waiver of the cause for divorce, must amount to a reconciliation and a reunion of the parties, and may be by express agreement of the parties to forgive the past and continue to live together or be implied from the conduct of the injured party.

2. DIVORCE—CONDONATION.—Where plaintiff, after a separation, visited his wife at her parent's home, and agreed upon terms of reconciliation with her, and took her back to his home, a distance of three miles, and, after waiting ten or fifteen minutes, announced to her that they could not get along together and against her protest carried her back to her parents, his acts amounted to a condonation of any existing causes for divorce.

Appeal from Lawrence Chancery Court, Eastern District; *Geo. T. Humphries,* Chancellor; reversed.

*W. A. Cunningham* and *W. E. Beloate,* for appellant.

1. The facts do not constitute adultery on the part of appellant. 110 N. Y. 658; 71 *Id.* 137; 9 A. & E. Enc. "Adultery."

2. The mere indiscretions of the wife were condoned by appellee. 23 Ark. 621; 87 *Id.* 179; 14 Cyc. 637.

3. The charge of cruelty is a recriminatory defense to adultery. 128 Ark. 110; 6 A. & E. Am. Cases 169 and note p. 172.

*W. P. Smith,* for appellee.

1.   Adultery was fairly proved.   110 N. Y. 658, and cases cited by appellant.

2.   There was no condonement.   23 Ark. 615; 53 Id. 484.

McCULLOCH, C. J.   This is an action instituted by a husband against his wife to obtain a decree for divorce on the alleged ground of adultery. The parties intermarried in December, 1914, and lived together until on or about July 2, 1917, a girl baby having been born unto them in the meantime, who was about a year and a half old at the time of the separation. The acts of adultery are alleged to have been had with one Swan during the month of May, 1917. The answer of the defendant contained a denial of the charge of adultery, but the court found the issue of fact in favor of the plaintiff and granted the divorce.

The plaintiff is a farmer residing in Lawrence County, out in the country a few miles from Alicia, and defendant's parents reside in the same neighborhood. The proof shows beyond dispute that the parties did not live happily together after a few weeks subsequent to their intermarriage. The proof shows, too, that the plaintiff was at fault in that his conduct toward his wife was overbearing, and intolerant, and at times brutal. He admits in his testimony that he determined a few weeks after the marriage that he and his wife could not live happily together and that he would have carried her back to her parents if he could have "put her back home in as good shape as he found her." The proof shows that plaintiff struck his wife on several occasions, once with a bed slat, and his own explanation shows that it was on very trivial grounds that he struck his wife. It seems that during the month of May, 1917, a rumor became current in the neighborhood that the defendant and Swan were corresponding with each other by letter, and that there were perhaps improper relations between the two. The first information communicated to plaintiff concerning the matter was made by defendant's father, and the plaintiff at once be-

gan an investigation which he says convinced him of the infidelity of his wife, and on July 2, he took her back to the home of her parents and left her there. The extent of the communications between defendant and Swan is fully developed in the testimony, and the defendant from the very start made frank admissions concerning them. The evidence shows that defendant wrote to Swan twice, once by postal card and the other time by letter, and in each instance she gave the communication to other parties to mail or deliver. The letter was unsealed and the contents of neither of the communications have been proved, except that one of the witnesses testified that, while he could not remember all of the contents of the letter, it began by addressing Swan as "Dear boy" or "Dear old boy." It appears from the testimony that defendant and Swan had been sweethearts before her intermarriage with plaintiff. The proof also shows that Swan wrote a letter to defendant in which he stated that rumors were current in the neighborhood concerning their conduct, and that it would be best for them to discontinue further communications. The communications between the defendant and Swan seem to have been conducted without any attempt whatever at secrecy. The letters were unsealed, and were intrusted for delivery to acquaintances who had full opportunity to read them, and who did read them.

The testimony also proved two meetings between defendant and Swan in plaintiff's absence. On one occasion defendant attended a singing school at a church house in the neighborhood one night, and left the place with Swan before the singing ended. The facts concerning their meeting come from defendant herself, and she states that she started home in company with Swan, but after walking together for a certain distance she heard some one coming, and realizing the awkwardness of the situation she ran away from Swan and went home alone. Defendant admits that in the letter to Swan she expressed her willingness for him to come to her home to see her while her husband was absent attending a lodge meeting. She

states that Swan came to the gate on the occasion mentioned and that she went out there to meet him. Her husband was absent, but others who lived in the house were there at the time. Defendant denied that there was any criminal intimacy between her and Swan, and there is no proof of such intimacy further than the correspondence and meetings above recited.

The chancellor concluded that acts of adultery were inferable from the proved relationship and communications between the parties. Since we have concluded to dispose of this cause on another issue, which will be presently discussed, it is perhaps unnecessary to determine whether the chancellor was justified in drawing the inference that acts of adultery had been committed between defendant and Swan, but when all the circumstances are considered together the inference is necessarily a very weak one, and it is doubtful, to say the least of it, whether it ought to be indulged so as to convict the defendant of so grave a charge of infidelity to her husband. The defendant from the very start admitted to her husband that she had been guilty of acts of indiscretion, and the openness with which the communications between those parties was conducted evinces a consciousness on her part of slight acts of indiscretion, rather than more serious acts of culpable immorality.

But, without passing on the question of the sufficiency of the evidence to warrant the finding of the chancellor, we pass to the further question in the case whether or not the alleged offense of adultery was condoned by the plaintiff so as to preclude him from pleading the original act as grounds for divorcee. The proof shows that after plaintiff carried his wife back to her parents on July 2, he visited her several times at that place, but there is a sharp conflict in the testimony as to the character and circumstances of those visits. Defendant testified that plaintiff remained there with her two nights and occupied the same bed with her and the baby. The testimony of others living in the house was to the effect that plaintiff occupied the same room with defendant on those two nights. Plain-

tiff denied this, however, and introduced testimony tending to show that he did not stay at the house of defendant's parents on those nights, or on any other night after he carried her back to the home of her parents. It is unnecessary to determine where the preponderance of testimony on that question lies, for we propose to base our conclusion on other admitted facts concerning the conduct of plaintiff toward his wife.

It is admitted that plaintiff visited his wife at the home of her parents on July 5, and that there in the presence of defendant's mother the parties agreed upon terms of reconciliation, and that they were to resume their relations as husband and wife, and that she was to return to his home. After entering into this agreement, plaintiff went out to the field where defendant's father was at work and told the latter about the reconciliation, and received the congratulations and good wishes of his father-in-law. Plaintiff went back to the house, and he and his wife started back on their journey to his home, a distance of about three miles, with the understanding that their reconciliation was complete. When they got to plaintiff's home, it was about dark, and after remaining there a very short time, perhaps ten or fifteen minutes, plaintiff announced to defendant that he had concluded that they could not get along together and directed that she get together some of her clothes and that he would take her back to her parents. She objected to going back, but he insisted, and against her protest he carried her back to her parents. Plaintiff's brother was living with him at the time, and they had cultivated a crop together, and the evidence tends to show that plaintiff's change of mind was brought about on account of his brother's threat that he would not live there if defendant was taken back into the home. Plaintiff denied that that was the cause of his change of mind, but he gives such an unsatisfactory explanation of his conduct at that moment that the conclusion is irresistible that his brother's attitude was the cause of his change of mind. We think the evidence shows that while he had fully made up his mind to take his wife back to his home and to become completely reconciled and

forgive her alleged past offense, he deliberately made a choice between her and his brother, and decided to give her up rather than suffer his brother to leave.

The question now presented is whether or not he made that choice too late, and is barred by his acts of reconciliation with his wife. The definition of condonation in its legal application to marital relations is stated by one of the text writers on that subject as follows: "Condonation is the voluntary forgiveness and remission of a cause for divorce upon the condition that the offender will reform and will not be guilty of another cause for divorce. The condonation, in order to constitute a waiver of the cause for divorce, must amount to a reconciliation and a reunion of the parties. The reconciliation may be by express agreement of the parties to forgive the past and continue to live together. But ordinarily the condonation is implied from the conduct of the injured party. One who relies upon a cause for divorce must not be guilty of inconsistent conduct. If such party has acted as if no real injury was inflicted, or has pursued a course of conduct evincing an intention to forgive the past and not apply for a divorce, he is estopped to declare a contrary intention." 1 Nelson on Divorce and Separation, Sec. 450. The same author in another section (452) further states the law on the subject as follows: "The conduct which amounts to condonation must be something more than mere verbal forgiveness. It must amount to a reconciliation of the parties to such an extent as to evince an intention to forgive the offense and an acceptance of the forgiveness by the offender. The offer of the injured party to return and resume cohabitation is not such a waiver of the past as will amount to condonation. At most, such offer amounts to a waiver only on condition that a reconciliation is brought about. Such offer is not inconsistent with an intention to apply for a divorce in case the offer is declined."

The conduct of the appellant according to his own admission contains all the elements necessary to constitute legal condonation of the alleged offense. It was vol-

untary and complete. It is true that he changed his mind and undertook to rescind his acts of forgiveness and reconciliation before the resumed relations with his wife had proceeded to the extent of actual cohabitation or sexual intercourse, but it is not essential that the relations should have proceeded to that extent in order to become complete and binding. There are two modes or forms of condonation; one express and the other implied, and, while there are some authorities that go to the extent of holding that an implied condonation is not completed with any act short of actual cohabitation, we find none of the authorities that hold that an express condonation need go to that extent.

There is no statute in this State on that subject, and we must, therefore, resort to the application of common law principles for the purpose of determining what does and what does not constitute an act of condonation which is binding.

We have already seen from the statements of the text writers on the subject that mere words alone are not sufficient to constitute even an express condonation unless acted upon by the parties by resuming to some extent the marital relations. In the language of the Lord Chancellor in the case of *Keats* v. *Keats,* 32 Law Times Rep. (O. S.) 321, condonation means "a blotting out of the offense imputed, so as to restore the offending party to the same position which he or she occupied before the offense was committed." The case just cited contains an interesting discussion on the subject of what is necessary to constitute a complete condonation, and the following is stated to be the law on that subject:

"It is true that forgiveness is an act of the mind, but it can only be manifested by words or by outward acts. The acts which prove forgiveness may be so strong and unequivocal, as by taking home an offending wife and cohabiting with her, that they may conclusively establish condonation. But words, however strong, can at the highest only be regarded as imperfect forgiveness, and, unless followed up by something which amounts to a recon-

ciliation and of a reinstatement of the wife in the condition she was in before she transgressed, it must remain incomplete. It has been argued that nothing less than renewed sexual intercourse will be sufficient to establish condonation. It is obvious, without adducing instances to illustrate my meaning, that that in some cases may be a test wholly inapplicable.''

The few cases which apparently hold to the rule that actual intercourse is essential to a completion of the condonation are cases where the husband or wife remained in the house with the offending party after discovering the acts of infidelity, and in none of the cases did it occur, so far as we can discover, that the parties had separated and afterwards resumed to any extent their relations as husband and wife. In the present case it is seen that there was a complete separation, and later a complete verbal reconciliation in the presence of other parties, and this was acted upon by a return of the wife to the home of her husband pursuant to the agreement that there was to be complete forgiveness and a resumption of the marital relation. They walked a distance of three miles to get back to their home, and it was only after they had gotten there that the plaintiff changed his mind and decided to recall his act of reconciliation. We think it was too late for him to do so, for he had deliberately entered into the agreement with his wife and permitted her to act upon that agreement by leaving the home of her parents and journeying back with him to their former home.

This conclusion is distinctly in line with our decision in the case of *Shirey* v. *Shirey,* 87 Ark. 175, where we held that the dismissal of a divorce suit pursuant to an agreement to resume the marital relation constituted a complete condonation of the alleged offense.

The decree of the chancery court is, therefore, reversed, and the cause is remanded with directions to dismiss the complaint for want of equity.