## PHINIZY *v.* PHINIZY.

1. The amendment to the plaintiff's petition, setting up cruel treatment as a ground of divorce, was not subject to the grounds of demurrer, either general or special.

   (*a*) A petition for divorce on the ground of desertion can be amended by adding cruel treatment as a ground.

   (*b*) The allegations of the amendment are sufficient to constitute a ground of divorce on the ground of cruel treatment.

   (*c*) Cruel treatment is the wilful infliction of pain, bodily or mental, upon the complaining party, such as reasonably justifies the apprehension of danger to life, limb, or health.

   (*d*) The allegations of the original petition and the amendment thereto do not seek to assert inconsistent rights and remedies, and do not put the plaintiff to his election to dismiss one of them or have his entire petition dismissed.

2. The verdict is contrary to the law and evidence, and a new trial should have been granted on this ground.

   (*a*) Having decided that the general demurrer to the amendment, setting up cruel treatment, was properly overruled, the plaintiff would be entitled to a verdict if he proved his case substantially as laid.

   (*b*) The husband and wife having entered into a written agreement, providing among other things for the support of the wife and for alimony, wherein it was recited that they were living in a state of separation and in which they expressly agreed to continue to live in such state, this precluded the grant to the husband of a divorce on the ground of desertion.

   (*c*) As a general rule, a single act of personal violence is not considered cruel treatment, but two or more such acts alone may furnish ground for divorce.

   (*d*) Yet a single act of cruelty may be so severe and atrocious as to justify a divorce; and a single act of cruel and inhuman treatment, accompanied by circumstances indicating a probability of a repetition of similar conduct, will warrant a divorce.

   (*e*) As the courts are loath to grant a divorce for a single act of personal violence, where a suit for divorce is based upon a single act of violence and upon frequent previous outbursts of temper, the origin of such violence and outbursts of temper, and the circumstances attending the same should be fully laid before the jury, and it should be made to appear that the wife was at fault and the husband did not provoke the same, especially when cruel treatment, as a ground of divorce, was not insisted upon until more than seven years after its occurrence.

3. Condonation is forgiveness, either express or implied, by a husband of his wife, or by a wife of her husband, for a breach of marital duty, with an implied condition that the offense shall not be repeated.

   (*a*) Condonation is more readily presumed against the husband than the wife.

   (*b*) Where a husband, after the wife's alleged cruel treatment, visited her and slept for two nights in the same room with her at a hotel, the wife testifying that he had sexual intercourse with her on this occasion, but

the husband denying such intercourse and claiming that they slept in different beds, such conduct of the husband, in the absence of any explanation on his part of this occurrence, amounted to condonation of the past offenses of his wife, and will prevent the grant of a divorce to him.

(c) Sexual intercourse is not an essential element of condonation, although it is conclusive evidence thereof.

4. The above rulings make it unnecessary to consider any of the other grounds of alleged error.

No. 2858.  SEPTEMBER 19, 1922.

Divorce.  Before Judge Hammond.  Richmond superior court. October 4, 1921.

On November 20, 1920, Jacob Phinizy filed his petition for divorce against Mary V. Phinizy, and alleged: (1) that on April 6, 1899, he and Mary V. Foster intermarried in Richmond County, Georgia; (2) that they lived together as husband and wife until March 9, 1915; (3) that he has been a bonà fide resident in the County of Richmond, State of Georgia, since 1879; (4) that the defendant is a resident of said county; (5) that on March 9, 1915, the defendant deserted him in said County of Richmond, and her desertion of him since said date has been wilful and continuous; (6) that he, by agreement in writing, signed by himself and the defendant, dated July 22, 1915, and recorded in the clerk's office of the superior court of Richmond County, entered into a contract to pay defendant certain monthly allowances, which were accepted by the defendant in lieu of all alimony, and which payments have been duly made from the date of said agreement, which binds him to pay said sums set forth therein during the lifetime of the defendant; and that for this reason he does not set forth a schedule of his property for the purpose of determining the amount of temporary and permanent alimony that might be due the defendant.  He prayed for a total divorce.  On June 22, 1921, he amended his petition and alleged: (7) "That for several years prior to February, 1915, the defendant was repeatedly and wilfully guilty of acts of cruel treatment towards plaintiff, thereby injuring his health, disturbing his peace of mind, and causing his nervous system to become greatly impaired and his general health involved; that her said conduct and cruel treatment from frequent outbursts of passion on her part, which culminated on an occasion at their Greene street home in Augusta, Georgia, during the month of November, 1913, the exact date petitioner being un-

able to recall, while they were alone in their said home, when wilfully, without justification, defendant suddenly and violently, and with her utmost strength, seized petitioner with both of her hands, by his throat, in an effort to choke him, thereby wilfully inflicting upon petitioner bodily pain, and when petitioner had forcibly disengaged defendant's grip from his throat, and while she was violently struggling to inflict further bodily pain upon him, she exclaimed, ' If I had a pistol I would kill you.' " (8) " That defendant's conduct on said occasion convinced petitioner that when defendant was seized with such outbreaks of passion or temper she was dangerous, and made him apprehensive that she would carry out her threat against his life." (9) " That thereafter, while defendant and plaintiff lived in the same house together, they did not live together as husband and wife, and he never condoned any of the alleged acts of cruelty in any manner whatever." (10) " That during all said time petitioner was making ample provision for the support of said wife, furnishing her means and funds in accordance with all her requirements and demands." (11) That, in addition to the original grounds of wilful desertion set forth in the original petition, petitioner is entitled to a divorce from the defendant on the ground of said cruel treatment; and he prays that he be granted a total divorce. (12) He struck from the second paragraph of his petition the words, " 9th day of March, 1915," and inserted in their place the words " —— day of November, 1913, the exact date petitioner cannot recall," and he struck from paragraph 5 of his petition the same words and inserted in their place the same words. The defendant demurred to this amendment, on the grounds: (1) that it introduced a new cause of action; (2) that the allegations of the amendment were not sufficient to constitute cruel treatment; (3) that the allegation in paragraph 10, to the effect that the reason he lived apart from his wife after February 15, 1915, was her acts of cruelty, is in direct conflict with the allegation in the original petition that defendant deserted plaintiff; and (4) various special grounds of demurrer. The trial judge overruled the demurrer, to which the defendant filed exceptions pendente lite, upon which she assigned error.

On the allowance of the plaintiff's amendment to his petition setting up cruel treatment, the defendant moved, in writing verified by her affidavit, for a continuance, on the ground that she and her

counsel were surprised by this amendment. It was shown that a copy of this amendment had been served on counsel for the defendant on June 7, 1921. The defendant alleged that she was less prepared for trial, because she was fully prepared for trial on the original ground of desertion, and because it required entirely different evidence to disprove the new ground of cruel treatment.

She further alleged that the plaintiff's infidelities against his marriage vows were numerous; that she had written acknowledgment of said infidelities up to a certain date; that she desired to recriminate; and she requested the court to permit her to get together her proof of said infidelities for proper presentation. The court overruled the motion to continue, to which ruling the defendant filed exceptions pendente lite, and she assigned error thereon. The case proceeded to trial, and the following evidence was introduced:

The plaintiff testified, that on April 6, 1899, he was married to the defendant, and they lived together as husband and wife until November, 1913. Mrs. Phinizy is a very difficult person to deal with. At that time, in one of her outbursts of temper, she threatened to choke him, and he had to force her hands away to keep her from choking him, and in this uncontrollable rage she stated that if she had a pistol she would shoot him. After that occurrence they did not continue to live together as husband and wife, though they remained in the same home until February, 1915. The conditions, when they lived together in the same home, were very strained. They would often go for days without speaking, and took their meals together without speaking. She occupied the front room, he the rear room, and the door between them was locked on her side. To the best of his recollection, she left in the spring or early summer of 1914, and went to the Springs. She stayed there until some time in the fall. She came back to Augusta after he had put the Greene street house in order for her. He has no recollection of seeing her and having relations with her after the fall or November, 1914; he means, going to see her and having relations with her. They did not continue to live together as husband and wife. From 1913 to February, 1915, while they were living in the same house, he had apprehension that his wife might do him some harm, because, when she was in those rages, he looked upon her as abnormal or

dazed. He didn't know what she was doing and didn't know what might occur, as she had the keys to the door between them. He was apprehensive, and it affected his health very seriously. His nervous condition was run down, and he was in general bad shape. He determined, on February 15th, that the best thing for him to do was to leave and go to his country home, where he could have a change; which he did. He never did condone the attack which his wife made upon him. The relation of husband and wife never existed after that attack. He continued to live in the same home with his wife after that attack, to save a public scandal. He shrank from having it before the public, on her and his own account. He saw, if he continued to stay there, that his health would be seriously affected. He stayed there as long as he could. He couldn't stand it any longer. He went to his country home in 1915. When he went there he provided for his wife by placing in the bank to her credit every month $500. He left all the furniture in the house, and one of the handsomest automobiles in the city. She had anything in the world that heart could wish.

Subsequently he entered into a contract with his wife to pay her $625 per month, and he expected to pay it to her as long as she lived. He had a country home at that time located six miles out on the old Savannah road. Mrs. Phinizy always spoke of it in the most derogatory manner to her friends, and on one occasion called it a hell's hole. She point-blank refused to go out there one time. It had been his home for seven or eight years. He didn't think he provoked the difficulty. He could not recall having provoked it. She would get in those moods very often, and especially if she was very tired. She had been out to a card party or luncheon, and came home very tired. There was no telling what she would say or do. He had often had to leave the house to avoid any conflict. This occurred upstairs in the hall, in the daytime, in the Greene street home. She came out and tried to choke him, and he pushed her off, and she stated at the time that if she had a pistol she would shoot him. She was in a violent rage. Q. "When Mrs. Phinizy grabbed you by the throat, was it with both hands?" A. "Yes." Q. "You felt the physical pain?" A. "Yes." She was not attempting to do any other bodily harm to him at the time. He couldn't tell what she would have done, but he resisted her by taking her hands from

his throat. These differences that arose between them were transpiring more or less for several years after they were married, from time to time. This thing was growing worse and worse, year by year. She couldn't control herself. He might have provoked his wife's outbursts of temper at times, but he thinks she was more censurable than he was. It seemed he couldn't please her. Q. "Do you deny that you were frequently the provocation of these outbursts?" A. "O, I might have been at times, I will say."

February 15, 1915, was about the time he left. Q. "Well, but didn't you desert her?" A. "Well, that depends on the way you look at it." He left her under certain conditions. He wasn't living with her as man and wife. He left because he thought it was to the interest of his health that he should leave. After he wrote the letter in which he told his wife that when she got the letter he would have permanently left the home, her daughter tried to get him to go back and live with her mother. He had one breakdown before he married. His health was better for a while after he married. Had an operation and got better afterwards. Does not know about his marriage having improved his health for several years. The operation restored his health. It is a fact his health was better for a number of years after he was married than before. The first time he had fear about his life was after the performance of her choking him, and threatening to shoot him. He lived in the same house with her for sixteen months in constant fear of his life. He felt to a certain extent unsafe. He didn't know what would happen, or what time it would happen. He did not condone this act, and never had any marital relations with his wife from November, 1913, up to the present day. He and his wife occupied the same room at a hotel at White Sulphur Springs in 1914, but occupied different beds. He might have gone from White Sulphur Springs to Atlantic City, but he could not tell whether he and his wife occupied the same room at the latter place. Does not deny that he and his wife occupied the same room at White Sulphur in Virginia. He cannot say that he did not occupy the same room.

Mrs. Mary V. Phinizy testified: There is not a single, solitary word of truth in the allegation that sometime in November, 1913, over in my house on Greene Street, I grabbed Mr. Phinizy with both hands by the throat, and tried to choke him, and that he

pulled my hands apart, and that I said, if I had a pistol I would kill him. I never struck Mr. Phinizy in any way. He never did at any time tell me he was afraid of me. I saw no indication of fear on his part whatsoever.

He had marital relations with me after November, 1913. I recall the summer that I was at White Sulphur Springs. He came to see me there. We occupied the same room, No. 213. Mr. Phinizy had marital relations with me then. He had marital relation with me at Atlantic City. I never deserted him. Mr. Phinizy was quite an ill man before he was married. He had some liver trouble that produced dropsy. For several years after he married his health was very good, I should say. He had several attacks of illness at our home. Not only did I nurse him, but I was very highly complimented because I nursed him so well. I lived out at Circular Court when he lived out there. Since the differences between us, I asked Mr. Phinizy what was his complaint against me. He said he had none. His reply was that I had given him general satisfaction. I first learned that Mr. Phinizy intended to leave me, when I received that letter. The last two years I have seen him occasionally. I never did refuse to live at Circular Court. I never brought up the subject of divorce at all. He wanted me to sue him for divorce on the ground of desertion. I did not agree to it. I told him I was not a commercial proposition, and there was no price that he could offer me that would make me do such a thing. Then what happened was this suit. I have no complaint to make against him. He has been, most of the time, well meaning. In an interview after this suit was brought, he strongly advised me not to defend this suit, to let it go by default, that it would be much better for me. I had just sense enough to know that it was not, according to my way of thinking, an honest way to act, to tell a lie; and I didn't do it. Cross-examination: He most certainly did make the endeavor to obtain my consent to his having the divorce without my objection. He said there was nothing in the world he wouldn't do for me, he would crawl on his knees from here to New York for me, and yet there wasn't one thing that I would do for him. I said, "Not in regard to a divorce." He did make a definite proposition that I bring a suit for divorce against him. I was very indignant when the proposition was made to me. At the time of my

marriage to Mr. Phinizy I had been divorced. Was divorced in Sioux Falls, South Dakota. That divorce was granted very nearly a year before I married Mr. Phinizy. I have lived in Georgia all my life. My husband from whom I was divorced lived in Georgia at the time I brought suit for divorce. I was making a visit to Aiken in 1915, and on my return I found a letter addressed to me by Mr. Phinizy (referring to letter of February 17, 1915). I never lived with him after that in the same house or home. He made me an offer in that letter. I did not accept it. I put the matter in the hands of a lawyer, with the result that a contract was made. That contract provided for my support during my life. I accepted the arrangement and the separation. After that was signed, I undertook some negotiations with Mr. Phinizy by my lawyer in Atlanta. It was three years ago, or something like that. I was temporarily in Atlanta. I did not propose to Mr. Phinizy, through the Atlanta lawyer, that if this agreement would be set aside, and he would settle on me a large amount of money for my support, he might obtain a divorce. Re-direct: Mr. C. Henry Cohen, the close and intimate friend of my husband, represented me in those divorce proceedings. Mr. Phinizy paid him. Re-cross. I have no recollection of Mr. Cohen appearing in the South Dakota Court. I am quite clear it was not Mr. Cohen. Mr. Jacob Phinizy, whom I afterwards married, paid Mr. Cohen to procure a divorce for me in South Dakota. I think Mr. Cohen managed it all. During the month of November, 1913, I was at St. Andrews Hotel, New York City. Got back home the latter part of November, about Thanksgiving.

The defendant introduced the following writings:

(1) An agreement between her and plaintiff, dated July 22, 1915, providing for her support and alimony, in which there is the statement: " That the parties hereto are husband and wife, and are now and have been for some time past living separate and apart, and have already agreed that they shall continue to live separate and apart."

(2) The following letter from plaintiff to defendant, dated Feb. 17, 1915:

" Dear Mary: The time has arrived that it is absolutely out of the question for us to continue to live together. I am satisfied much more contentment and better health would come to us

both by living apart. In reaching this conclusion, I am not unmindful of my legal and moral obligations to you, and with that end in view, I propose to you the following terms to be in full of all claims which I am legally liable to you in the premises:

" 1. I will give you an unquestioned bond and security, guaranteeing to you an income of six thousand dollars ($6,000.00) a year, payable monthly on the first day of each month, putting $500.00 to your credit in the Georgia Railroad Bank or any depositary that you may designate.

" 2. The residence on Greene street (No. 529), you already have a life interest in, and the contents you can use during your life. I will pay all State, county, and city taxes and assessments of any character that may be made against this property, and keep it well insured, both building and contents. There are certain articles of silverware, pictures, books, and possibly a few other minor things in the way of rugs and furniture that you may not wish to retain, as you would have no use for them. If such be the case, why of course I could use them to advantage.

" 3. The usual bills for February will be paid by me as heretofore.

" 4. The Pierce-Arrow landaulet will be left in the garage for your use and benefit, and you can employ any chauffeur that you see fit to serve you in that capacity.

" When you receive this letter I shall have left the house permanently, but with no feeling of resentment or ill-will. I only wish for you happiness, health, and that quietude for your remaining days that you have so earnestly and eagerly wished for.

" If my proposition, which I think is fair and just, is accepted, I would ask that you advise me in writing or through counsel; and I will have arranged such legal papers in conformity therewith to insure you the income and privileges which I have set out as above.

" I do trust and hope that you will accept these terms, so the separation can be quiet, dignified, and decent in every respect. If after it is done we both solemnly pledge to withold from the public and quasi friends any of our private affairs, it will not only be best for us, but we will no longer be in the limelight. But if you do not see fit to accept what I think is liberal in the way of terms and the manner of separation, I will be forced to resort to other means, which will be not only unpleasant to us

but a sweet morsel for the scandal-mongers of the city to roll under their tongues. Spare yourself this as well as myself, and let's agree to disagree in a spirit that is dignified and sensible under the circumstances.

" Augusta, Ga.,                              Very respectfully,

" Feby. 17, 1915."                          Jacob Phinizy.

(3) Letter from plaintiff to defendant, dated July 3, 1920: " Presuming of course you will be leaving the city very soon for the summer, I write again to ask that you take up for some definite conclusion the question of divorce that we have had recently under consideration. You must realize that our living together is impractical on account of the very great difference in temperament. It is now over five years since our separation, and we should not be compelled to go through life for the years that will be normally left us married only in name. I do not think I have to assure you of being in full sympathy with you, and ready now, as I have always been, to aid you in any way in my power; and in proof of this feeling, realizing the condition of the times and the high cost of living, I am willing to increase your monthly allowance to $700.00 per month, or, if you prefer, I am willing to make you a substantial payment of $20,000 in cash, and continue your present monthly allowance. I hope you will treat this in the spirit in which it is written, and that you will let me hear from you in the very near future.

" July 3rd. 1920.                           Respectfully,

" Augusta, Ga."                             Jacob Phinizy."

(4) Undated letter from plaintiff to defendant: " Since leaving you a few minutes ago, I came to the bank and consulted the Code of Georgia. I find I am not liable for your attorney's fee in the action for divorce. I was liable in separation contract which provided for alimony. I paid your attorney, Mr. W. H. Barrett, $1,000 in these proceedings. I thought it nothing but fair and just that I should impart this information to you at once. I repeat again the best thing for you to do is to allow the present action to go by default. Please have key to gate and garage sent to me. What do you think of my paying you $8,000 for your life interest in house, with privilege of storing your furniture in garage as discussed?

." Yrs. resp. Jacob Phinizy."

Mrs. A. J. Salinas testified for defendant: I am a sister of

Mrs. Phinizy. The afternoon Mr. Phinizy left, Mrs. Phinizy asked me to come over to the house, and showed me his letter (referring to letter of Feb. 17, 1915). Up to that time I had never heard of Mrs. Phinizy's making a personal assault upon Mr. Phinizy. Was familiar with the occurrences going on in the family, and was intimate with my sister. Never heard Mr. Phinizy say one single word about his wife had threatened to kill him, or that he was afraid of his wife. I know that my sister nursed him when he was sick. He said to me she nursed him and made a good nurse. On one occasion at 529 Greene Street, where she nursed him, he told me Mrs. Phinizy nursed him and had been so attentive to him. I think probably that was after 1913. He was sick several times and Mrs. Phinizy nursed him. That night when she got the letter from Mr. Phinizy, she 'phoned for an automobile, and I went with her out to Circular Court to see if he was there and ask why it was he had taken this step.

The jury returned a verdict for the plaintiff, and the defendant moved for a new trial on various grounds. The court overruled the motion, and the defendant excepted.

*William H. Fleming,* for plaintiff in error.

*Callaway & Howard* and *C. H. & R. S. Cohen,* contra.

FISH, C. J. (After stating the foregoing facts.)

1. The court did not err in overruling the demurrer to the plaintiff's amendment of his petition, in which he set up cruel treatment as a new ground of divorce. The first ground of the demurrer is, that the amendment introduces a new cause of action. This has been ruled adversely to the defendant. *Zachary* v. *Zachary,* 141 *Ga.* 404 (81 S. E. 120).

The second ground of the demurrer is, that the allegations of the amendment are insufficient to constitute such cruel treatment as will authorize the grant of a divorce under our divorce statute. " In case of cruel treatment or habitual intoxication by either party, the jury, in their discretion, may grant either a total or a partial divorce." Civil Code (1910), § 2946. Our statute does not define what is meant by cruel treatment; but this court has defined it. It " is the wilful infliction of pain, bodily or mental, upon the complaining party, such as reasonably justifies an apprehension of danger to life, limb, or health." *Ring* v. *Ring,* 118 *Ga.* 183 (44 S. E. 861, 62 L. R. A. 878); *Stoner* v.

*Stoner,* 134 *Ga.* 368 (67 S. E. 1030; *Miller* v. *Miller,* 139 *Ga.* 282 (77 S. E. 21) ; *Skellie* v. *Skellie,* 152 *Ga.* 707 (111 S. E. 22).

It is alleged that prior to February, 1915, the wife was repeatedly and wilfully guilty of acts of cruel treatment towards the husband, thereby injuring his health, disturbing his peace of mind, greatly impairing his nervous system, and involving his general health, said conduct and cruel treatment resulting from frequent outbursts of passion on her part, which culminated at their Greene street home in Augusta, Georgia, during the month of November, 1913, he being unable to recall the exact date, in an attack by his wife on him while alone in their said home, when wilfully and without justification she suddenly and violently and with her utmost strength seized him with both her hands by his throat in an effort to choke him, thereby wilfully inflicting upon him bodily pain, and when he had forcibly disengaged her grasp from his throat, and while she was violently struggling to inflict further bodily pain on him, she exclaimed, "If I had a pistol, I would kill you." It is further alleged that the wife's conduct on that occasion convinced the husband that when she was seized with such outbursts of passion she was dangerous, that he became apprehensive that she would carry out her threat against his life, that, while they lived in the same house together for some time thereafter, they did not live together as husband and wife, and that he had never condoned any of the alleged acts of cruelty in any manner whatever. These allegations constitute a case of cruel treatment, and upon due proof thereof the jury would be authorized, in their discretion, to grant either a partial or total divorce. *Pierce* v. *Pierce,* 145 *Ga.* 886 (89 S. E. 1045).

The next ground of demurrer is, that the allegation in the amendment, that the husband left the wife on account of her cruel treatment of him, is in direct conflict with the allegation in the original petition, that the wife had deserted the husband.

The causes of action must be inconsistent, to put the plaintiff to his election to dismiss one of them, or to have the entire suit dismissed. *Timmerman* v. *Stanley,* 123 *Ga.* 850(4), 855 (51 S. E. 760, 1 L. R. A. (N. S.) 379). Inconsistent allegations of fact, if such there be, unless they constitute inconsistent causes of action, will not work the dismissal of the suit. We have seen that desertion and cruel treatment do not constitute inconsistent causes

of action, but make only different but harmonious grounds of divorce. So we are of the opinion, that the court did not err in overruling the general demurrer to the amendment; and we are likewise of the opinion, that the special grounds of demurrer are without substantial merit.

2. We will now consider the question, whether the verdict is without sufficient evidence to support it. To the consideration of this point we have given long and patient thought. Having reached the conclusion that the general demurrer to the amendment, setting up cruel treatment, was properly overruled, the plaintiff would be entitled to a verdict if he proved his case substantially as laid. The decision on the demurrer thus becomes conclusive. *Sims* v. *Ga. Ry. & El. Co.,* 123 *Ga.* 643 (51 S. E. 573); *Brooks* v. *Rawlings,* 138 *Ga.* 310 (75 S. E. 157); *Tompkins* v. *American Land Co.,* 139 *Ga.* 377(4) (77 S. E. 623); *Bailey* v. *Ga. & Fla. Ry.,* 144 *Ga.* 139 (86 S. E. 326); *Benson* v. *Andrews,* 149 *Ga.* 758 (102 S. E. 148).

In his original petition the husband alleged that his wife had wilfully deserted him, and that her desertion of him had been continuous since 1915. The allegations of the amendment, which set up, for the first time, the cruel treatment of himself by his wife as a ground of divorce, are as follows: (1) that the wife was repeatedly and wilfully guilty of acts of cruel treatment towards the husband; (2) that these acts of cruel treatment injured his health, greatly impaired his nervous system, and involved his general system; (3) that her said conduct and cruel treatment resulted from frequent outbursts of passion on her part; (4) that these outbursts of passion culminated in an assault upon him by his wife in November, 1913; (5) that this assault was wilful and without justification; (6) that this assault was effected by the wife suddenly and violently, and with her utmost strength, seizing him with both hands by his throat, in an effort to choke him; (7) that the wife thereby wilfully inflicted upon him bodily pain; (8) that when he had finally disengaged her grip from his throat, and while she was violently struggling to inflict further bodily pain upon him, she exclaimed that if she had a pistol she would shoot him; (9) that, becoming apprehensive that his wife would carry out her threat against his life, he separated from her, and had never condoned any of said

acts of cruelty in any manner. This is the plaintiff's case on paper. Does he make it out by his proof?

So far as the ground of desertion is concerned, the husband wholly failed to sustain the same by proof. On the contrary, on July 22, 1915, he and his wife entered into a written contract providing, among other things, for the support of the wife, wherein it is recited that they were living in a state of separation, and wherein they expressly agreed to continue to live in such state. Here the husband consents to their separation. This killed his right to a divorce on this ground. Civil Code (1910), § 2948; *Word* v. *Word,* 29 *Ga.* 281; *McCord* v. *McCord,* 140 *Ga.* 170 (78 S. E. 833) ; 19 C. J. 64, § 120.

How stands the proof upon the subject of cruel treatment? There is no proof of any physical violence inflicted by the wife upon the husband prior to November, 1913. The husband testifies that the wife, prior to this date, indulged in outbursts of passion, and would get in these moods very often. Otherwise there was no evidence that the wife "was repeatedly and wilfully guilty of acts of cruel treatment towards plaintiff," as alleged in this amendment. There was evidence of but a single act of violence, which took place when the wife was in a rage. As a rule, a single act of personal violence is not considered cruel treatment. Nye's Appeal, 126 Pa. 341 (17 Atl. 618, 12 Am. St. R. 873) ; Hoshall *v.* Hoshall, 51 Md. 72 (34 Am. R. 298) ; Hardie *v.* Hardie, 162 Pa. 227 (29 Atl. 886, 25 L. R. A. 697) ; Fritz *v.* Fritz, 138 Ill. 436 (28 N. E. 1058, 14 L. R. A. 685, 32 Am. St. R. 156) ; Cutler *v.* Cutler, 2 Brewst. 511; Finley *v.* Finley, 9 Dana (Ky.), 52 (33 Am. D. 528) ; Joyner *v.* Joyner, 6 Jones' Eq. (59 N. C.) 322 (82 Am. D. 421) ; Reed *v.* Reed, 4 Nev. 395. But it has been held that two such acts alone may furnish ground for divorce. Sharp *v.* Sharp, 16 Ill. App. 348; Campbell *v.* Campbell, 27 Ill. App. 309; Farnham *v.* Farnham, 73 Ill. 497; Sharp v. Sharp, 116 Ill. 509 (6 N. E. 15). Especially is this so when the assaults are accompanied by violent and indecent language. Day *v.* Day, 56 N. H. 311. It has been asserted that no single act of cruelty, however severe, that falls short of endangering life, is sufficient to justify a divorce. May *v.* May, 62 Pa. St. 210; Nye's Appeal, supra.

Yet a single act of cruelty may be so severe and atrocious as to justify a divorce. Richards *v.* Richards, 1 Grant (Pa.), 391; May *v.*

May, supra; Nye's Appeal, supra; 9 R. C. L. 339, § 119. The actual commission of a single act of cruel and inhuman treatment, accompanied by circumstances indicating a probability of a repetition of similar conduct, will warrant a divorce. Beyer *v.* Beyer, 50 Wis. 254 (6 N. W. 807, 36 Am. Rep. 848). But this assault was accompanied by a declaration that if she had a pistol she would shoot her husband; and it was for the jury to say, whether the two together were sufficient to make the husband apprehensive of danger to his life.

However, as courts are loath to grant a divorce for a single act of physical violence, the facts and circumstances accompanying its infliction should be fully laid before the jury. The full history of the assault in this case should have been given to the jury.

It is alleged that it was wilful and without justification. The burden was on the plaintiff to make good this allegation. Did he carry this burden? When asked by his counsel, if he provoked the difficulty of November, 1913, which resulted in the separation, the plaintiff replied that he did not think he provoked it, and he could not recall provoking it. He does state that his wife would get into those moods very often, especially when she was very tired, and on the day of the difficulty she had been to a card party and had come home very tired. He does not say that her tired condition was the cause of her effort to choke him. On his cross-examination he stated that he might have at times provoked these outbursts of anger on the part of his wife. The evidence fails to show the origin, cause, and circumstances of the wife's effort to choke her spouse. It is necessary to allege and prove the circumstances connected with the assault charged, and the cause which brought it about. Joyner *v.* Joyner, supra; Nogees *v.* Nogees, 7 Tex. 538 (58 Am. D. 78); White *v.* White, 84 N. C. 342. It is alleged that it was without justification; but the proof fails to sustain this important allegation. Whether it was justifiable depends upon the circumstances attending the origin and progress of this row, about which the evidence of the husband is silent. Such a showing is specially demanded in case of a long lapse between the alleged acts of cruel treatment and the bringing of a suit for divorce on that ground. More than seven years elapsed between the cruel treatment and the filing of the plaintiff's action for divorce. When he filed his suit it was

based upon the ground of desertion; and the ground of cruel treatment seems to have escaped his attention, and was entirely omitted from his application for divorce. More than seven years had gone by when the husband amended his application and set up this ground. It is true we have no statute of limitations applicable to suits for divorce, but "the lapse of time between the occurrence of a ground for divorce and the application therefor may be considered by the jury, and, if not satisfactorily explained, may be good ground for refusing the divorce;" and "if the interval between the offense, when known, . . and the bringing of the suit be very long, a court and jury should be indisposed to relieve a party who appears to have slumbered over it, unless some satisfactory reason be shown." *Mosely* v. *Mosely,* 67 *Ga.* 92; *Flynn* v. *Flynn,* 149 *Ga.* 693 (101 S. E. 806).

The evidence for the plaintiff failing to show the origin, cause, and circumstances of the frequent outbursts of passion on the part of the wife, and of the culminating act of cruelty, on which the plaintiff mainly relies for a divorce, the same failing to show that this assault was without justification, and the plaintiff testifying that he might, in part, have been the cause of the outbursts of temper on the part of his wife, the verdict is without evidence to support it, and the learned trial judge erred in not setting it aside.

3. Did the husband condone the alleged cruelty of his wife? The last act of cruelty on the part of the wife occurred in November, 1913. In the summer of 1914, the wife visited White Sulphur Springs in Virginia, and thence went to Atlantic City. While the wife was at White Sulphur Springs, the husband visited her, and he admits that while there he spent two nights in the same room in a hotel with his wife. The wife testified that on this occasion the husband indulged in sexual intercourse with her. This the husband denied, and testified that, while he and his wife slept in the same room, they slept in separate beds. The incredulous might doubt and deny this testimony of the husband, but a confiding jury of the vicinage could believe the husband and discredit the wife. So we must deal with the case from the standpoint of the husband's testimony that he did not have sexual intercourse with his wife during the nights he slept in the same room with her at the hotel at White Sulphur Springs

The wife testified, that at Atlantic City during the same summer her husband again slept with her in the same room at their hotel, and that her husband again indulged in sexual intercourse. The husband could not recall this occurrence at Atlantic City.

So the question is narrowed down to a single point, and that point is, does the fact that the husband admits that after acts of cruel treatment, he occupied with his wife the same room in a hotel at a watering place, but testifies that he slept in a separate bed, and did not have sexual intercourse with his wife, amount to condonation of the past cruel treatment, so as to prevent the grant to him of a divorce on that ground? " If there has been a voluntary condonation and cohabitation subsequent to the acts complained of, and with notice thereof, then no divorce shall be granted." Civil Code (1910), § 2948. Condonation is forgiveness, either express or implied, by a husband of his wife, or by a wife of her husband, for a breach of marital duty, with an implied condition that the offense shall not be repeated. *Odom* v. *Odom,* 36 *Ga.* 286 (5); *Davis* v. *Davis,* 134 *Ga.* 804 (68 S. E. 594, 30 L. R. A. (N. S.) 73, 20 Ann. Cas. 20); Cuming *v.* Cuming, 135 Mass. 386 (46 Am. R. 476).

Condonation is more readily presumed against the husband than the wife. *Odom* v. *Odom,* supra. The fact that the husband had a friendly interview with his wife, and requested her to return home and live with him, did not amount to condonation. *Johns* v. *Johns,* 29 *Ga.* 718 (3). It is sufficient proof of condonation, that the husband, after knowing of his wife's offense, visits her and occupies at such times the same bed. Reed *v.* Reed, 62 Ark. 611 (37 S. W. 230) ; Bordeaux *v.* Bordeaux, 30 Mont. 36 (75 Pac. 524), 32 Mont. 159 (80 Pac. 6) ; Todd *v.* Todd (N. J.), 37 Atl. 766. Cohabit means "to dwell together." *Davis* v. *Davis,* supra. So strong is the inference that marital relations are resumed where the parties cohabit, that it has been held, where a wife, after filing suit for divorce, went with her husband to a hotel, and there occupied the same room and lived with him for some months, that this conduct was inconsistent with the maintenance of her suit for divorce, although she declared that they did not occupy the same bed or cohabit. Lee *v.* Lee, 51 Ill. App. 565. It has also been held that this is the law, even though the husband testifies that he did not take off his clothes, and

furthermore that he did not have sexual intercourse with the wife, other testimony being to a contrary effect. It has been likewise decided, that, notwithstanding the testimony of the parties under such circumstances that there was no sexual connection, the court will draw the usual inference from their conduct. Todd *v.* Todd (N. J.), 37 Atl. 766; Tilton *v.* Tilton, 16 Ky. Law R. 538 (29 S. W. 290). All the authorities agree that, if they occupy the same room and bed, a strong presumption of marital intercourse arises, and a consequent condonation of the offense follows. Burns *v.* Burns, 60 Ind. 259; Toulson *v.* Toulson, 93 Md. 754 (50 Atl. 401); Rogers *v.* Rogers, 67 N. J. Eq. 534 (58 Atl. 822); Hann *v.* Hann, 58 N. J. Eq. 211 (42 Atl. 564); Marsh *v.* Marsh, 13 N. J. Eq. 281; Karger *v.* Karger, 19 Misc. 236 (44 N. Y. Supp. 219); Hall *v.* Hall (Eng. 1891), P. 302. But this presumption may be rebutted. Brown *v.* Brown, 164 Ill. App. 589.; Hann *v.* Hann, Hall *v.* Hall, supra. Is such strong presumption overcome by the statement of the husband, that, while he occupied the same room at the hotel with his wife for two nights, they did not sleep in the same bed, and that they did not indulge in sexual commerce, where the wife testified that he did have sexual intercourse with her, and where the husband wholly failed to give the facts and circumstances under which he found himself occupying the same room with his wife at a fashionable watering place? We do not deem it necessary, for the proper decision of this case, to answer this question, but refer to Todd *v.* Todd (N. J.), 37 Atl. 766, for an interesting discussion of this situation. Sexual intercourse is not a necessary element of condonation. Where it occurs it is conclusive evidence of condonation. A single act of sexual intercourse by the innocent spouse, after the discovery of the offense, is ordinarily sufficient to constitute condonation, especially against the husband. Farmer *v.* Farmer, 86 Ala. 322 (5 So. 434); Shirey *v.* Shirey, 87 Ark. 175 (112 S. W. 369); Phillips *v.* Phillips, 102 Ark. 679 (144 S. W. 914); Delliber *v.* Delliber, 9 Conn. 233; Toulson *v.* Toulson, 93 Md. 754 (50 Atl. 401); Harper *v.* Harper, 29 Mo. 301; Todd *v.* Todd (N. J.), 37 Atl. 766; Marsh *v.* Marsh, 13 N. J. Eq. 281; Pitts *v.* Pitts, 52 N. Y. 593; Doe *v.* Doe, 52 Hun, 405 (5 N. Y. Supp. 514); Karger *v.* Karger, supra; Sparks *v.* Sparks, 94 N. C. 527; Eggerth *v.* Eggerth, 15 Or. 626 (16 Pac. 650).

But, as stated above, sexual intercourse is not a sine qua non of condonation. It has been held that the dismissal of a divorce suit, pursuant to an agreement to resume marital relations, constituted a complete condonation of the alleged offense. Shirey *v.* Shirey, 87 Ark. 175 (112 S. W. 369). "A husband completely condoned a known adultery by expressly forgiving the wife, telling others they were reconciled, and going with her three miles to their home, although in a few minutes thereafter he renounced the reconciliation because of his brother's objection, and took her directly to her parents, and cohabitation and sexual intercourse were not resumed." Bush *v.* Bush, 135 Ark. 512 (205 S. W. 895, 6 A. L. R. 1153). "One who admits that after being informed of his wife's adultery, and believing it, he occupied the same room with her at a house other than theirs, and, as she claims, had intercourse with her, will be held to have condoned her offense," although the husband denied that he had sexual intercourse with the wife. Todd *v.* Todd (N. J.), 37 Atl. 766. If this were not the case, the impotent husband could never condone the wife's divorceable offenses. Condonation is not revocable at will. Davis *v.* Davis, supra.

Under the admitted facts, the husband, by his conduct at the White Sulphur Springs, condoned the alleged previous cruelty of the wife. This being so, the verdict granting him a divorce was contrary to the law and evidence, and should have been set aside.

4. The above holdings render it unnecessary to consider any of the other alleged errors.

*Judgment reversed. All the Justices concur.*